SIERRA PACIFIC POWER COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 80–7453.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 1982.

Decided July 20, 1982.

Rehearing Denied Aug. 27 and Sept. 30, 1982.

James K. Mitchell, Reid & Priest, Washington, D. C., for petitioner.

Jeanne S. Whiteing, Boulder, Colo., A. Karen Hill, Washington, D. C., argued, for respondent; Michael R. Thorp, Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn, Tacoma, Wash., on brief.

Before TRASK, SNEED and TANG, Circuit Judges.

TRASK, Circuit Judge:

Petitioner, Sierra Pacific Power Company (Sierra), challenges a ruling made by respondent, the Federal Energy Regulatory Commission (Commission or FERC), which found the Truckee River to be a navigable water of the United States as defined by section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8), and ordered Sierra to obtain a license pursuant to sections 4(e) and 23(b) of the Act, 16 U.S.C. §§ 797(e), 817, to operate its hydroelectric power projects along the Truckee. In addition, petitioner asserts that it was denied a fair hearing because the Commission failed to provide adequate notice of the issues that would be decided in the jurisdictional hearing. In particular, Sierra contends it was not notified that the Commission would consider the scope of the project to be licensed or the issue of "hydraulic coordination" between Sierra's facilities.

We conclude that the Truckee is not a navigable water of the United States because it lacks a navigable interstate linkage by water. *Minnehaha Creek Watershed District v. Hoffman*, 597 F.2d 617, 622–24 (8th Cir. 1979). The Truckee is not a "continu[ous] highway over which commerce is or may be carried on with other States . . . ." *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). Because we decide that the river fails to meet the criteria for navigability, thus precluding FERC regulation, we do not reach the question of whether Sierra was afforded a fair hearing on hydraulic coordination and whether Independence and Donner Lake Reservoirs were waters incidental to electric power development. Because the Commission's exercise of licensing jurisdiction hinged on the purported navigability of the Truckee, we reverse the Commission's order requiring Sierra to obtain a license for its hydroelectric power facilities.

I. Description of the Truckee River

The Truckee River begins at Lake Tahoe, California, and flows northeastwardly for 110 miles terminating at Pyramid Lake, Nevada. Sierra operates four hydroelectric plants along a fourteen-mile portion of the river beginning approximately twenty-seven river miles from the Truckee's source at Lake Tahoe, or six miles upstream from the point where the Truckee crosses from California into Nevada.[1] Pyramid Lake is located entirely within the Pyramid Lake Indian Reservation.

The Truckee descends the eastern side of the Sierra Mountains with an average gradient of twenty-five feet per mile. Most of the drop occurs during the first forty-seven miles of the river's course, between Lake Tahoe and Reno. Petitioner states that the stretch of the river on which its power plants are located descends at an average

---

1. The four plants operated by petitioner are:

| Plant | Capacity | Year Constructed | Plant | Capacity | Year Constructed |
|-------|----------|------------------|-------|----------|------------------|
| Farad | 2800 kw | 1899 | Verdi | 2400 kw | 1911 |
| Fleish | 2000 kw | 1905 | Washoe | 1500 kw | 1904 |

slope of forty-five feet per mile. This gradient, Sierra contends, is substantially greater than in any area above or below its power plants. Opening Brief for Petitioner at 7. FERC asserts that Sierra's description is inaccurate and states that the fourteen-mile portion where Sierra operates its plants descends at a rate of thirty-five feet per mile, similar to the gradient upstream from Sierra's projects. Brief for Respondent at 3. The Commission's findings indicate that the gradient does increase along the portion of the Truckee where Sierra's plants are situated and that the steepest drop of 100 feet per mile occurs in the boulder-filled one-half mile stretch above Floriston at river mile twenty-seven.[2]

The river varies in width from 50 feet to 150 feet and the average depth varies from one and one-half feet to four feet. The average flow of water in the Truckee during the years 1900 to 1975 was 249 cubic feet per second. But the flow varies widely from year to year and during each year; the flow is normally greater in the spring and fall.

## II. Administrative Proceedings

In July 1975, the Pyramid Lake Paiute Tribe of Indians (Tribe) instituted a proceeding before the Commission seeking a ruling that Sierra must obtain a license under the Federal Power Act to operate its power plants on the Truckee. Specifically, the Tribe alleged that the Truckee is a navigable water of the United States as defined in section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8), and that Sierra's power plants are therefore subject to FERC's licensing jurisdiction. The Tribe indicated that the rates of flow of water were not sufficient to maintain the Tribe's fisheries in the Truckee and Pyramid Lake and that requiring Sierra to obtain a license for its plants would enable the rates of flow to be adjusted to improve the quality of fishing.

On January 14, 1977, the Commission set the matter for hearing. Pursuant to this order, a hearing was held on May 31, 1977, in Reno, Nevada. The Commission staff, the Tribe and intervenors United States Department of Interior and the State of Nevada submitted various exhibits and other evidence concerning the past use and suitability for use of the Truckee River for floating logs to sawmills. In addition to the evidence presented at the hearing, the Administrative Law Judge (ALJ) toured the Truckee River and visited one of Sierra's power plants. On November 25, 1977, the ALJ issued an Initial Decision in which he found that the evidence failed to establish that the Truckee was a navigable water of the United States and that the Commission therefore lacked jurisdiction over Sierra's power plants. Excerpt of Record at 14–15.

In Opinion No. 61 issued on August 10, 1979, the Commission reversed the ALJ's

---

2. In Opinion No. 61, the Commission provided the following description of the Truckee's course:

> The gradient of the Truckee River is negligible for the first 3 miles from the Lake Tahoe outlet dam. There are rocky passages for the next 2 to 3 miles to Squaw Creek, and the gradient descends 40 feet per mile, but for the next 9 miles to Truckee at river mile 14 there are fewer rocks and the gradient decreases to 30 feet per mile. Donner Creek flows into the Truckee River in that reach at about river mile 12.5. For the next 10 miles the gradient continues to descend at 30 feet per mile, there are rocky passages and the Truckee is joined by Martis Creek at river mile 17, Prosser Creek at river mile 20 and the Little Truckee River at Boca at river mile 21.5. And for the next 6 miles to Floriston at river mile 27, the gradient descends at 25 feet per mile for 5.5 miles until two long boulder-filled drops are reached in the last half mile, where the gradient is 100 feet per mile. Juniper Creek flows into the Truckee River in the beginning of that reach at about river mile 23.
>
> For the next 9 miles to Verdi at river mile 36, passing Sierra's Farad and Fleish facilities together with its Verdi diversion dam and part of its Verdi conduit, the gradient descends at 35 feet per mile and the river is rocky, particularly in the reaches where the diversions reduce the flows. Just beyond that reach, at about river mile 37, Dog Creek flows into the Truckee River (footnotes omitted).

ER 31–32. The Commission's discussion of the gradient of the Truckee does not extend beyond river mile thirty-seven.

decision regarding the navigability of the Truckee. In its ruling, the Commission relied on cases interpreting section 3(8) of the Federal Power Act which defines navigability for purposes of FERC's jurisdiction.[3] The Commission indicated that a waterway is navigable if it is presently used or is suitable for use as a highway for interstate commerce, or if it has been used to transport goods or persons in commerce in the past, or if it could be made suitable for such use in the future by reasonable improvements. ER 38, *citing United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *Rochester Gas and Electric Corporation v. Federal Power Commission*, 344 F.2d 594, 596 (2d Cir.), *cert. denied*, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965). Applying this standard, the Commission held the Truckee to be navigable and ordered Sierra to obtain a license for the operation of its power plants.

After deciding the issue of jurisdiction, the Commission also determined the scope of the project subject to licensing. Sierra was ordered to include its Independence Lake reservoir in its license application. In addition, Sierra and the Truckee-Carson Irrigation District were ordered to show cause why a license should not be required for their jointly-owned Donner Lake reservoir. Subsequently, in Opinion No. 61–A issued in August 1980, the Commission denied Sierra's petition for rehearing and a request for stay of FERC's opinion pending appeal. The Commission found that Sierra failed to show cause why the Donner Lake reservoir did not require a license. Sierra was ordered to file its license application by February 8, 1981.

### III. Navigable Waters of the United States

We find that no substantial evidence supports the Commission's finding that the Truckee River meets the criteria for navigable waters of the United States.

Section 23(b) of the Federal Power Act, 16 U.S.C. § 817, provides that hydroelectric power projects "across, along or in any of the navigable waters of the United States" must be licensed by FERC. Section 3(8) of the Act defines "navigable waters" to include the portions of streams or waterways which either in their natural or improved condition, notwithstanding non-navigable interruptions that might require "land carriage," are used or suitable for use in transporting goods or persons in interstate commerce. 16 U.S.C. § 796(8); *see* n.3, *supra.* Any "interrupting falls, shallows, or rapids" occurring along an otherwise navigable stream together with any portions of the waterway authorized by Congress for improvement are included as navigable waters under section 3(8). *Id.*

The Supreme Court has defined navigable waters of the United States, as opposed to navigable waters of a State,[4] as waterways that form "in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the

---

**3.** As defined in section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8), navigable waters include:

Those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such other parts of streams as shall have been authorized by Congress for improvement by

the United States or shall have been recommended to Congress for such improvement after investigation under its authority.

**4.** Portions of the Truckee River have been declared or assumed navigable waters of the state by the California legislature and various Nevada courts. *See* Act of April 4, 1870, ch. 513, 1869–1870 Cal. Stats. 771 (1870); *Reno Brewing Co. v. Packard*, 31 Nev. 433, 443, 103 P. 415 (1909) (title dispute); *Shoemaker v. Hatch*, 13 Nev. 261 (1878) (title dispute); *Boardman v. Lake*, 8 Nev. 276 (1873) (tollbridge franchise dispute). We decide nothing here that would disturb those rulings. Rather, our holding is that the Truckee is not a navigable water *of the United States.*

customary modes in which such commerce is conducted by water." *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). Later decisions have broadened the definition of navigability to include bodies of water which were navigable in their natural state although they may not presently meet the criteria, *Economy Light & Power Co. v. United States*, 256 U.S. 113, 123, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921), and those which might be made navigable with reasonable improvements. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 407–08, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940).

In addition, the Supreme Court requires a navigable interstate linkage by water. In *The Montello*, 78 U.S. (11 Wall.) 411, 415, 20 L.Ed. 191 (1870), the Court stated:

> If, however, the river is not of itself a highway for commerce with other States or foreign countries, or does not form such highway by its connection with other waters, *and is only navigable between different places within the State*, then it is not a navigable water of the United States, but only a navigable water of the State . . . .

(emphasis added); *National Wildlife Federation v. Alexander*, 613 F.2d 1054, 1058–61 (D.C.Cir.1979); *Minnehaha Creek Watershed District v. Hoffman*, 597 F.2d 617, 623 (8th Cir. 1979); *Hardy Salt Co. v. Southern Pacific Transportation Co.*, 501 F.2d 1156, 1167 (10th Cir.), *cert. denied sub nom Sanders Brine Shrimp Co. v. Southern Pacific Transportation Co.*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).

The record in this case clearly shows that the Truckee has been used for floating logs to lumber mills in California from its source at Lake Tahoe to Boca at river mile twenty-three, and in Nevada from river mile thirty-seven to river mile fifty-two. To find the Truckee a navigable water of the United States, FERC must demonstrate: (1) that the middle stretch of the river which crosses from California into Nevada, approximately from river mile twenty-three to river mile thirty-seven, has been used or is suitable for use for the transportation of property; or,

(2) that this state-line reach of the river is an "interruption . . . compelling land carriage;" or, (3) that improvements authorized by Congress on the Truckee exist where the power plants are located.

### A.  Use or Suitability for Use

■ For the Truckee to be navigable, use of the river need not be extensive, or long and continuous. *Puget Sound Power & Light v. FERC*, 644 F.2d 785, 789 (9th Cir. 1981), *cert. denied*, 454 U.S. 1053, 102 S.Ct. 596, 70 L.Ed.2d 588 (1981). Downstream flotation of shingle bolts is sufficient evidence to support a finding of navigability. *Id.* at 789–90. But the transportation of property or persons must be interstate. *E.g.*, *The Montello, supra.*

■ The evidence concerning use or suitability for use of the state-line reach is less than substantial. *See* Brief for Respondent at 29–31; Brief for Intervenors (the Tribe) at 21–22. In support of its finding of navigability, the Commission noted that in 1865 the Eastman Mill near Reno was reported to have contracted for a large quantity of logs which "probably" were cut upstream in California and driven from river mile twenty-three across the state line. ER 54–55. The Commission also relied on a newspaper account indicating that in 1878 timbers for the Comstock mine were driven "a considerable distance" down the Truckee to Reno. Because the same newspaper a few months previously had reported two thirteen-mile log drives from Verdi to Reno, the Commission reasoned that the "considerable distance" in the later account must have started from a point upstream from Verdi in California. ER 55–56. This evidence is tenuous at best and does not support a finding that the state-line reach of the Truckee was used for transporting timber.

■ Evidence of the Truckee's suitability for use is also insubstantial. In addition to the evidence of actual use discussed above, FERC relied upon an asserted absence of evidence that the navigable character of the river changes along the state-line reach. ER 59 n.52. Yet the Commission acknowledges that a "possibly significant obstruc-

tion to navigation" exists in the half mile before river mile twenty-seven: two long boulder-filled drops are found in this stretch and the gradient is 100 feet per mile. ER 59; *see also* ER 32. The first of Sierra's facilities, Farad power plant, is located just below river mile twenty-seven, and the Commission's opinion confirms that the gradient of the Truckee throughout the next fourteen miles where Sierra's plants are situated is greater than the incline upstream from Sierra's developments. ER 31–32. Although a river may be considered suitable for transportation of property if it could be made so by reasonable improvements, *United States v. Appalachian Power Co.*, 311 U.S. 377, 407–08, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940), the evidence does not indicate that the state-line reach of the Truckee could be improved for navigation at reasonable cost.[5]

### B. *Interruption Compelling Land Carriage*

Even assuming that the state-line reach of the Truckee is not navigable in fact, the Commission indicated that this portion of the river qualifies as an interruption between navigable parts of the river. ER 59. Under section 3(8) of the Federal Power Act, 16 U.S.C. § 796(8), a stream may retain its navigable status despite the occurrence of non-navigable interruptions which require portaging or "land carriage" to circumvent them. *See* n.3., *supra.* Congress included these "interruptions" within the statute's definition of navigability in order to prevent the steep gradients, falls, shallows and rapids that frequently occur at hydroelectric generation sites from themselves becoming a bar to FERC jurisdiction if the stream is otherwise navigable. *See* H.R.Rep.No.910, 66th Cong. 2d Sess. 7 (1920) (Conference Report).

Although the state-line reach of the Truckee arguably fits this description, we find that this portion of the river cannot be considered an "interruption" under section 3(8) because the river itself does not form a "continuous highway" for commerce between the states. The record shows that logs were placed in the Truckee and floated downstream to sawmills located in California above river mile twenty-three and that similar use was made of the river in Nevada below river mile thirty-seven. But we find no substantial evidence that the lumber industry utilized the middle portion of the river which crosses the border between the two states. Logs were not floated from California to Nevada on the Truckee. Nor is there any evidence that property or persons ever traveled downstream across the state-line reach of the Truckee with the aid of a portage or "land carriage." The evidence shows the Truckee is only navigable intrastate which does not satisfy the criteria for a navigable water of the United States. *The Montello*, 78 U.S. (11 Wall.) 411, 415, 20 L.Ed. 191 (1870).

### C. *Authorized or Recommended for Improvement*

■ As an alternative ground for finding the Truckee navigable, the Commission noted that the state-line reach of the river has been "authorized by Congress for improvement by the United States." ER 68–69. Section 3(8) of the Federal Power Act provides that portions of streams authorized for improvement or recommended to Congress for improvement after investigation under its authority are included within the Act's definition of navigability. 16 U.S.C. § 796(8).

We find that the improvements cited by the Commission are inadequate to make the

---

5. Sierra's brief states that:

The major sources of lumber and the principle sawmills along the Truckee River were located upstream from River Mile 23. So long as its rates remained reasonable, the railroad provided an efficient, economical mode of transportation of lumber from the sawmills to the markets. Because the forests below River Mile 23 were less dense and farther from the river valley, there was no lumbering on the portion of the river between River Mile 23 and River Mile 37. Therefore, ... the improvement of the Truckee River below Boca in order to permit the transportation of logs and lumber, even if physically possible, would have been of very little value. (citations to record omitted). Opening Brief for Petitioner at 32.

**1140**

Truckee navigable. All the projects involve flood control or reclamation. In *Montana Power Co. v. Federal Power Commission*, 185 F.2d 491, 495 (D.C.Cir.1950), *cert. denied*, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951), the court interpreted section 3(8) to refer to improvements authorized by Congress to facilitate navigation. We do not adhere to the Commission's view that any improvements authorized by Congress under its commerce powers are sufficient to render a waterway navigable in law. *See* ER 69. The authority cited by the Commission, *United States v. Appalachian Power Co.*, 311 U.S. 377, 426, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940), does not support its broad argument. In *Appalachian Power*, the Supreme Court discussed the scope of Congress' authority regarding the regulation of navigable waters of the United States and rejected the argument that the constitutional power of the United States to use or regulate navigable waterways is limited to the control of navigation. The Court held that Congress' authority is based in the commerce power and extends beyond the operation of boats and the improvement of the waterway itself: "Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control." *Id.* (footnote omitted). Navigable waters of the United States are subject to regulation under Congress' broad commerce power, but FERC attempts to work this syllogism in reverse. Congress' action in authorizing flood control and reclamation projects unrelated to navigation does not establish that the Truckee is navigable for purposes of FERC licensing jurisdiction. The Federal Power Act limits FERC's jurisdiction to navigable waters as defined in section 3(8). Although Congress' authority under the commerce clause might extend to commerce conducted along waters lacking an interstate connection by water, the court in *National Wildlife Federation v. Alexander*, 613 F.2d 1054, 1059–60 (D.C.Cir.1979), held that when a statute limits its reach to navigable waters of the United States, it should be construed as applying only to waterways having an interstate connection.

In short, we conclude that the Commission's determination of navigability is not supported by substantial evidence. Accordingly, the decision and orders of the Commission are reversed and remanded.